The NATIONAL BANK OF
SOUTH CAROLINA

v.

The UNITED STATES.

No. 381–78.

United States Court of Claims.

April 30, 1980.

William E. DuRant, Jr., Sumter, S. C., attorney of record, for plaintiff.

Elizabeth Langer, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This contract case is before the court on cross-motions for summary judgment. The motions, on which we have heard oral argument, present four issues: (1) the authority of a county supervisor of the Farmers Home Administration (FmHA) to make a binding representation concerning the disbursement of funds loaned to a farmer by a Federal land bank, the FmHA having made a complementary loan to the farmer; (2) the consideration which defendant received for entering into what plaintiff, the National Bank of South Carolina, purports to be a contract between plaintiff and defendant; (3) the sufficiency of evidence in the record tending to show that defendant performed fully its obligation under the purported contract; and (4) the applicability of the parol evidence rule to a telephone conversation between an agent of plaintiff and an agent of defendant. Having considered carefully the four issues, we deny both motions for summary judgment.

### I.

In August 1976, the FmHA loaned $38,380 to a married couple (the Bradhams) to enable them to purchase certain farm acreage. Contemporaneously with the making of the FmHA loan, the Federal Land Bank (FLB) of Columbia, South Carolina, loaned money to the Bradhams to enable them to construct a residence on the farm acreage. The sum of $36,080 of the FLB loan funds was escrowed by the FLB for construction.

The Bradhams entered into a contract for construction of the residence with Mr. Mims, a builder. The contract provided that Mims would receive partial payments as the construction was being performed and a final payment after satisfactory completion of construction. The partial payments were not to exceed, in the aggregate, 60 percent of the value of the work in place.

Mr. Mims requested plaintiff to provide interim financing of his construction of the Bradham residence. A branch manager of plaintiff, Mr. DeWitt, discussed with a county supervisor of the FmHA, Mr. Foxworth, how plaintiff could protect itself if it did provide the interim financing and how much money the interim financing might involve. On September 7, 1976, a loan committee of plaintiff approved a $13,000 maximum loan commitment to Mims. Funds provided pursuant to the commitment were to be applied by Mims on the costs which he incurred in constructing the Bradham residence.

Also, on September 7, 1976, apparently pursuant to a telephone conversation between Foxworth and DeWitt occurring after plaintiff had approved the loan commitment, Foxworth sent to DeWitt a letter in which he stated:

*In accordance with our telephone conversation this date* you are advised that National Bank of South Carolina will be shown as joint payee on *all* checks issued to Winfield Mims for the construction of the Thomas M. Bradham dwelling.

The contract price for construction of the dwelling if [*sic*] $29,850. * * *

Funds for payment of this contract are being held in escrow by Federal Land Bank. Federal Land Bank is being notified by a copy of this letter to show National Bank of South Carolina as joint payee on all checks. [Emphasis supplied.]

The FLB made plaintiff a joint payee only on three of the checks issued to Mims on the funds escrowed for the construction of the Bradham residence. The total amount of the three checks was $13,400. To finance Mims' construction of the Bradham residence, plaintiff loaned Mims approximately $19,500, an amount substantially in excess of the $13,000 maximum loan commitment.

Mr. Mims defaulted on his debt obligations to plaintiff. The obligations included the $19,500 loan. Plaintiff obtained in a state court action a judgment for the amount which Mims owed to it. Execution on the judgment was returned *"nulla bona."*

In the action in this court, plaintiff sues defendant for breach of contract. Plaintiff alleges that the FLB should have made plaintiff a joint payee on all checks which were issued to Mims on the funds escrowed for the construction of the Bradham residence.

## II.

The FmHA, an agency within the United States Department of Agriculture, provides real estate loans to farmers. The Farm Credit Administration (FCA), an independent agency within the executive branch of the Federal Government, has as an objective the encouragement of farmer participation in the management and ownership of agricultural credit. The FCA supervises Federal land banks. Each Federal land bank is a farmer-owned corporation with no connection with the Federal Government other than being supervised by the FCA.

Section 1821.11(d) of 7 C.F.R. (1976) governs relationships between the FmHA and other lenders. Subsection (d)(2) provides that a memorandum of understanding between the FmHA and FCA is to serve as a guide in processing FmHA real estate loans made simultaneously with loans by federal land banks to common applicants. The memorandum of understanding, which is reproduced as Appendix I to 7 C.F.R. Part 1821A (1977), sets forth policies and procedures for making these joint participation loans. Paragraph II(c)(2) of the memorandum provides:

> \* \* \* The FmHA and [Federal land bank] representatives will mutually approve any land and building development plans when the improvements are to projected in loan values. *Each will supervise the disbursement of its share of funds for these items.* [Emphasis supplied.]

Defendant argues that, pursuant to paragraph II(c)(2), no official of the FmHA has authority over the disbursement of a joint participation loan made by a Federal land bank. More specifically, defendant argues that Foxworth, as a county supervisor of the FmHA, lacked authority to make a binding representation concerning the disbursement of the FLB loan funds escrowed for construction of the Bradham residence. In sum, defendant invokes the time-honored principle that the Federal Government is not bound by its agent acting beyond his authority and contrary to regulation.

■ Defendant's argument is too broad-brushed. Nothing in the language of paragraph II(c)(2) prohibits, expressly or by implication, a Federal land bank from *delegating* authority over the disbursement of its joint participation loans to an agent or agents of the FmHA. In fact, such a delegation would accord with the spirit of the memorandum of understanding. The memorandum is intended to foster cooperation between the FmHA and Federal land banks and to encourage their joint participation in meeting the credit needs of farmers. Hence, we hold that paragraph II(c)(2) of the memorandum does not preclude a delegation by a Federal land bank, to a county supervisor of the FmHA, of authority over the disbursement of a joint participation loan made by the Federal land bank.

Such a delegation need not be made explicitly. It might be implied by a course of dealing between the FmHA and a Federal land bank. Or it might be implied by a written instrument. In the instant case, on the basis of the record before us, we are unable to ascertain whether the FLB of Columbia, South Carolina, delegated to FmHA's Mr. Foxworth authority over the disbursement of any of the FLB loan funds escrowed for construction of the Bradham residence.[1] If it is found later that a dele-

---

1. We note, however, that there is substantial evidence of a delegation. For example, the construction contract between the Bradhams and Mims specified that the FmHA was to supervise the construction of the Bradham residence. The FLB loan funds escrowed for the construction were disbursable to Mims only after the FmHA had approved his work.

Two other items of evidence tend also to show that there was a delegation: (1) The FLB made plaintiff a joint payee on three of the checks issued on the FLB loan funds; and (2)

gation was made, the extent of the delegation must be determined. Thus, at least two material issues of fact remain genuinely in dispute at this stage of the litigation.

### III.

Defendant argues that it neither bargained for nor received consideration for its purported agreement with plaintiff. More specifically, defendant argues that Foxworth's representations concerning disbursement of the FLB loan funds did not obligate plaintiff to make a loan commitment to Mims. If defendant received no consideration for Foxworth's representations, no contractual obligation would have attached to defendant.

■ Defendant's argument is grounded on an assumption which may be erroneous, namely, that, in exchange for Foxworth's representations, defendant received merely an unenforceable promise made to it by plaintiff, the promise being to provide interim financing to Mims. Yet (apparently prior to the telephone conversation between Foxworth and DeWitt) plaintiff approved, through its loan committee, Mims' application for interim financing. Thus, defendant may have received more than merely plaintiff's promise; defendant may have received *the action* whereby plaintiff approved Mims' application. If so, that action constituted a receipt of consideration by defendant. Hence, whether defendant received consideration remains a material unresolved fact.

### IV.

Defendant argues that, assuming that it was under a contractual obligation to plaintiff, the obligation was that the FLB would make plaintiff a joint payee on checks *the aggregate amount of which was $13,000.* Because the FLB made plaintiff a joint payee on checks the aggregate amount of which was $13,400, defendant argues that it has performed fully any contractual obligation owed to plaintiff.[2]

■ Plaintiff's position is that the FLB should have made plaintiff a joint payee on *all* checks issued to Mims. Plaintiff argues that, if the alleged contract between defendant and it had limited the aggregate amount of checks on which it was to be made a joint payee to $13,000, the contract would have been of no value to plaintiff as a security device. For, plaintiff argues, Mims needed the entire amount of the initial checks drawn on the FLB loan funds for use in obtaining labor and materials for construction of the Bradham residence. Plaintiff insists that the security contemplated by the alleged contract consisted of the later disbursements of the FLB loan funds, these disbursements representing profit for Mims.[3]

The evidence in the record pertaining to this issue is in conflict. In our view, the issue is divisible into three questions. (1) Did the alleged contract limit the aggregate amount of checks on which plaintiff was to

---

the letter which Foxworth sent to DeWitt appears to have been routine.

**2.** Some of the evidence in the record supports defendant's argument. For example, in an affidavit, Mr. Foxworth states: "At no time did I ever agree to request that the [FLB] make the National Bank of South Carolina joint payee on checks over and above the $13,000 loan commitment." At the time or times Foxworth made representations concerning disbursement of the FLB loan funds, he had been informed, apparently, that the loan commitment to Mims which plaintiff was considering would involve a ceiling not in excess of $13,000.

**3.** Three evidentiary items in the record support plaintiff's position. (1) In an affidavit, Mr. DeWitt states: "That I discussed financing of Mims construction with Billy K. Foxworth,

* * * and was promised by him that the [FmHA] would make the National Bank of South Carolina joint payee on all checks issued to Winfield Mims from loan proceeds being held by it for the construction of the Thomas M. Bradham dwelling." (2) In a deposition taken by defendant, DeWitt states, with reference to a conversation which he alleges to have had with Foxworth: "And he [Foxworth] said, well, they [the FmHA] could protect us [the National Bank of South Carolina] by making all checks payable jointly to the bank and to Winfield Mims." (3) The letter which Foxworth sent to DeWitt reads: "[FLB] is being notified by a copy of this letter to show National Bank of South Carolina as a joint payee on all checks."

be made a joint payee to $13,000? (2) If not, was plaintiff to be a joint payee on all checks issued to Mims *until* plaintiff recovered, vis-a-vis this security device, the *portion* of the money which it had loaned to Mims for construction of the Bradham residence *which was not in excess of its $13,000 maximum loan commitment?* (3) Or, was plaintiff to be made a joint payee on all checks issued to Mims until plaintiff recovered the entire amount of money which it had loaned to Mims for construction of the Bradham residence even if that amount exceeded its $13,000 maximum loan commitment? Because the evidence in the record is in conflict, we are unable to answer these questions. In short, the answers remain genuinely in dispute.

## V.

Plaintiff argues that the alleged contract between defendant and it was reduced to a writing, namely, the letter from Foxworth to DeWitt. The letter read in part:

> *In accordance with our telephone conversation this date* you are advised that National Bank of South Carolina will be shown as joint payee on *all* checks issued to Winfield Mims for the construction of the Thomas M. Bradham dwelling. [Emphasis supplied.]

Plaintiff argues that, because this language was unambiguous, no parol evidence is admissible in this action to vary the natural meaning of the language. Hence, plaintiff argues, the court must construe the alleged contract to have provided that plaintiff was to be made a joint payee on all FLB checks issued to Mims.

Plaintiff's argument rests on an erroneous assumption, namely, that the letter *was* the alleged contract between defendant and it. The letter was not the contract; the letter was merely a confirmation of whatever agreement had been reached by Foxworth and DeWitt. They developed their agreement in one or more conversations between themselves, the conversations having taken place prior to the writing of the letter and having culminated in the telephone conversation. The letter itself implied that it was being written as a *consequence* of the telephone conversation. Thus, the letter is merely evidence of the terms of the alleged contract between plaintiff and defendant. If there was a contract, it was made orally and is to be found in the conversations between Foxworth and DeWitt. Evidence concerning these conversations is clearly admissible in this action.

## VI.

Unfortunately, considering the amount in issue, the case is not mature for disposition by summary judgment and we remand it to the trial division for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is denied; and defendant's cross-motion for summary judgment is denied.