Jack LOPINSON, George Bradley, William Murphy, Jr., Claude Vealy

v.

The UNITED STATES.

No. 572–87C.

United States Claims Court.

Nov. 9, 1988.

Jeffrey D. Newby, Philadelphia, Pa., for plaintiffs.

Thomas W. Petersen, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

### OPINION

YOCK, Judge.

This contract case comes before the Court on the defendant's motion to dismiss the complaint for lack of jurisdiction, pursuant to RUSCC 12(b)(1). For the reasons discussed herein, the motion is granted.

*Facts*

Plaintiffs, inmates at the State Correctional Institution at Graterford Pennsylvania, seek compensation for services they performed as apprentices in the Stationary Engineering Program at the Institution during 1981 and 1982. They allege that their entitlement to compensation arises under the Comprehensive Employment and Training Act (CETA), 29 U.S.C. § 801 *et seq.* (Supp. II 1978) (repealed 1982), and/or under an express or implied contract between themselves, the Commonwealth of Pennsylvania, and the United States, acting through the Department of Labor, Bureau of Apprenticeship and Training.

On September 10, 1981, plaintiffs entered into contracts with the Joint (Multi–Trades) Apprenticeship and Training Committee (JATC) at Graterford Correctional Institution for the apprenticeship of plaintiffs in the Stationary Engineering Program at the Institution. The JATC is composed of officials from the Pennsylvania Bureau of Corrections, Pennsylvania Department of Education, and the Graterford Vocational School and supervised by the Pennsylvania Apprenticeship and Training Counsel (PATC). The apprenticeship program at Graterford is also overseen on the federal level by the United States Department of Labor's Bureau of Apprenticeship and Training (BAT). The BAT was established:

"[T]o formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship, and to cooperate with the Office of Education under the Department of Health, Education, and Welfare * * *." Section 2 of the Act authorizes the Secretary of Labor to "publish information relating to existing and proposed labor standards of apprenticeship," and to "appoint national advisory committees * * *." [citation omitted.]

(b) The purpose of this part is to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, or acceptable apprenticeship programs with the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training. These labor standards, policies and procedures cover the registration, cancellation and deregistration or apprenticeship programs and of apprenticeship agreements; the recognition of a State agency as the appropriate agency for registering local apprenticeship programs for certain Federal purposes; and matters relating thereto.

29 C.F.R. § 29.1(a) (1981), *citing,* 29 U.S.C. § 50a.

The BAT's involvement in the apprenticeship program at Graterford is set out in the Standards of Apprenticeship of the Multi–Trades Apprenticeship and Training Committee for the State Correctional Institution at Graterford (hereinafter Standards of Apprenticeship or Standards). For example, under the Standards and the apprenticeship agreements, the BAT is recognized as the official federal consulting agency for the program. The BAT is notified of all cancellation of apprentices from the program and the reasons therefor. An agreement signed by each apprentice is supplied to the apprentice and the BAT.

All materials pertinent to the Standards of Apprenticeship are forwarded to the PATC through the local office of the BAT. Finally, the BAT receives a copy of the officially signed and properly executed Standards of Apprenticeship. BAT ultimately would grant certification to inmates who successfully completed the apprenticeship program.

The program at Graterford was not directly funded through the BAT. It is unclear, however, whether the PATC was subsidized through the Comprehensive Employment and Training Act (CETA), 29 U.S. C. § 801 *et seq.* (Supp. II 1978) (repealed 1982).

In any event, the plaintiffs allege that on September 10, 1981, Mr. Raymond Barrett, a representative of BAT, presented each plaintiff with a contract to enter into the Stationary Engineering Program at Graterford. Mr. Barrett told plaintiffs that if they entered into the program, they would initially be paid at the minimum wage rate and that their wages would increase in accordance with their development in the program. However, Mr. Barrett indicated that since the plaintiffs' exact pay scale could not accurately be predicted at the time of the signing of the contracts, the rate of pay section would be left blank. The plaintiffs signed the contracts between themselves and the JATC.[1] The plaintiffs state that subsequent to the signing, the JATC altered the contracts to prevent plaintiffs from receiving the money allegedly promised them by Mr. Barrett of the BAT. The plaintiffs have received no compensation whatsoever for the work they performed in completing the 8,000 hours required in order to obtain the certification of stationary engineer pursuant to the terms of the contract and are seeking individual payment in the amount of some $26,800.

The defendant asserts that this Court lacks jurisdiction and has now moved pursuant to RUSCC 12(b)(1) to dismiss this action.

*Discussion*

In support of its motion to dismiss the complaint, defendant argues that the Court lacks jurisdiction over plaintiffs' claims for several reasons. First, the defendant contends there is no express or implied-in-fact contract between the BAT and the JATC or between BAT and the plaintiffs. Second, the defendant asserts that the Government was acting in its sovereign capacity in administering the program at Graterford. As an alternative, the defendant argues that even if the Government was not acting in its sovereign capacity, the BAT does not have the authority to contract with private individuals concerning apprenticeship training or wages to be paid during such training. Finally, the defendant contends that there is no third party beneficiary status conferred on the plaintiffs because there is no underlying contract between the Federal Government and the state that would support that status.

Although the plaintiffs now admit that there is no express contract between the plaintiffs and the Federal Government, they argue that an implied-in-fact contract exists between the plaintiff and the Government. The basis for this assertion is premised upon the representations made by the United States through its representative Mr. Barrett; the active role that the BAT played in sponsoring, supervising, and consulting Pennsylvania officials with regard to this program; and the unequal bargaining position of the plaintiffs and the United States.

Defendant's arguments persuade the Court that it lacks jurisdiction over plaintiffs' claim. In *Korea Development Corp. v. United States,* 9 Cl.Ct. 167, 173 (1985), this Court stated that a "high degree of involvement by a Government agency in a project will not serve to create an implied-in-fact contract between the United States and a private party where the United States is not a party to the underlying contract." The plaintiffs attempt to distin-

---

1. The BAT is not a party to the contract. In the "Standards of Apprenticeship" establishing the framework of the Graterford Program, an ap-

prenticeship agreement is defined as "the written agreement between the JATC and the person who is registered with the PATC."

guish *Korea* by arguing that the case is inapplicable because the parties to the contract in *Korea* were sophisticated, while the plaintiffs in this action lacked the necessary sophistication to protect their contractual rights. Although this argument has considerable sympathetic appeal, it is otherwise without merit. The Court's decision in *Korea* is simply not premised upon the sophistication of the parties. It is based exclusively on the long-standing policy that where the Federal Government is not a party to an express contract with the plaintiff, an implied contract does not exist simply because the Government is deeply involved in a given project in its sovereign capacity. Although the level of sophistication differs between the parties in *Korea* and the case at bar, this distinction in no way undermines the rationale of *Korea.* This policy is explained more fully in *D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 598, 372 F.2d 505, 507, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed. 2d 97 (1967) where the Court stated: "[i]t would be farfetched indeed to impose liability on the Government for the acts and omissions of the parties who contract to build the projects, simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a part of the costs." [2]

The Court agrees with the plaintiffs that the BAT played a considerable role in the functioning of the apprenticeship program at Graterford. Although his efforts failed, Mr. Barrett clearly attempted to ensure that congressionally mandated wage standards became a part of plaintiffs' contracts with JATC. In so doing, Mr. Barrett was merely attempting to carry out a congressional directive propounded to the Secretary of Labor, *see supra* p. 713, to ensure that the Graterford apprenticeship program met minimal standards. In essence, Mr. Barrett, a Federal Government official, sought to influence the terms of plaintiffs' contract with JATC. Although plaintiffs' decisions to contract were no doubt influenced by Mr. Barrett's representations and

an expectation of remuneration was created, such activity does not bind the Federal Government contractually to the plaintiffs. Again, substantial involvement by a Government agency in contract negotiations simply does not itself create an implied-in-fact contract.

Nevertheless, the plaintiffs contend that the actions by Mr. Raymond Barrett, a BAT employee, give rise to an implied-in-fact contract. In support of their argument, the plaintiffs point out that a representative of the United States allegedly presented the contracts to the plaintiffs for their signature. Moreover, Mr. Barrett dealt directly with the plaintiffs, and the plaintiffs relied upon Mr. Barrett's representation that they would be compensated for their efforts in completing the program. Finally, the plaintiffs note that it was Mr. Barrett who indicated that specific wage amounts could not be filled in on the contract since they would have to be determined at a later date as the program progressed.

Unfortunately, even if the above allegations are true, the Court still lacks jurisdiction over this suit. It is established that "[t]he officer whose promise is relied upon by plaintiffs must have had actual authority to bind the government to that promise." *Orchards v. United States,* 4 Cl.Ct. 601, 607, *aff'd,* 749 F.2d 1571 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *see also Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). The operation and responsibilities of the BAT are delineated in 29 C.F.R. Part 29 (1981). *See supra* p. 713. Nowhere in those regulations is BAT granted authority to contract with private individuals concerning apprenticeship training or their wages during such training. Thus, even if Mr. Barrett made the alleged statements concerning the plaintiffs' entering into the contracts with the JATC, he lacked the authority to do so. Hence, no implied-in-fact contract existed or could exist. *See Kania v. Unit-*

---

**2.** As in *D.R. Smalley & Sons,* the United States, via the BAT, was present in the case at bar simply to promote certain standards in order to advance the safety and welfare of the general public.

*ed States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268 ("The claimant for money damages for breach of an express or implied in fact contract *must show that the officer* who supposedly made the contract *had authority to obligate appropriated funds."* (emphasis supplied)), *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

This result is clearly unfortunate for the plaintiffs. But the law is clear that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. at 384, 68 S.Ct. at 3. This rule, as explained by the Supreme Court in *Federal Crop Ins.,* is in no way qualified by any directive that the parties be of roughly comparable sophistication. Not insensitive to "the hardship resulting from innocent ignorance," the Court nevertheless reaffirmed the rule that "[m]en must turn square corners when they deal with the Government * * *." *Id.* at 385, 68 S.Ct. at 3 (quoting from *Rock Island, Arkansas & Louisiana Railroad Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920)). Rather than reflecting a "callous outlook," the rule merely "expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Id.* In short, to hold the taxpayers accountable for an obligation to the plaintiffs that the Federal Government never assumed would compound misfortunes. While plaintiffs may have a valid action in the state court against the JATC or the PATC for wrongfully altering their contracts, it is a "time-honored principle that the Federal Government is not bound by its agent acting beyond his authority * * *." *National Bank of South Carolina v. United States,* 223 Ct.Cl. 573, 577, 621 F.2d 1109, 1111 (1980).

The plaintiffs also contend that they are third party beneficiaries of a contract between BAT and JATC. However, no such contract existed and thus beneficiary status is impossible. Even if the Standards of Apprenticeship could somehow be construed as creating a contract between BAT and JATC, the plaintiffs still could not recover. In order to prosper as a third party beneficiary, there must be evidence of an "intent that the promisor shall assume a direct obligation to the third party." *Montana Bank v. United States,* 7 Cl.Ct. 601, 611 (1985) (citations omitted). No evidence has been presented nor do the Standards of Apprenticeship imply that the BAT intended to assume an obligation to plaintiffs. Thus, absent the requisite intent, no third party beneficiary status is created, and hence no ground for recovery exists. *See generally Orchards v. United States, supra,* 4 Cl.Ct. at 609–10 (benefit flowing from contract performance does not create third party beneficiary status; intent is required).

In addition to the foregoing (if it is not already clear), the Government, while acting as a sovereign, cannot be saddled with liability under an implied-in-fact contract. *Somerville Technical Services v. United States,* 226 Ct.Cl. 291, 299, 640 F.2d 1276, 1281 (1981). An attempt to implement standards which promote the common good and general welfare clearly constitutes a sovereign act. *D.R. Smalley & Sons, Inc. v. United States, supra,* 178 Ct.Cl. at 597–98, 372 F.2d at 507. Thus, by attempting to include wage standards in plaintiffs' contracts of apprenticeship, Mr. Barrett was engaging in a sovereign act which prohibits liability from being imposed on the basis of an implied-in-fact contract.

## CONCLUSION

Since the Government has established that no contract, express or implied-in-fact, existed between it and the plaintiffs, nor was there any contract between the Federal Government and the state on which any third party beneficiary status could be established, the defendant's RUSCC 12(b)(1) motion is granted, and the Clerk is directed to enter judgment dismissing the complaint.

Each party is to bear its own costs.